RENDERED:  MARCH 12, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

**OPINION OF JANUARY 22, 2021, WITHDRAWN**

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0289-MR

MICHAEL GARDNER                                  APPELLANT

                APPEAL FROM MCCRACKEN CIRCUIT COURT
v.                 HONORABLE TIMOTHY KALTENBACH, JUDGE
                      ACTION NO. 19-CR-00633

COMMONWEALTH OF KENTUCKY                   APPELLEE

OPINION
AFFIRMING IN PART,
VACATING IN PART,
AND REMANDING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; COMBS AND JONES, JUDGES.

COMBS, JUDGE:  Michael Gardner appeals his criminal conviction in the

McCracken Circuit Court on charges of possession of a controlled substance and

resisting arrest.  He was sentenced to three-years' imprisonment, probated for five

years, and ordered to pay court costs and a fine. After our review, we affirm in part, vacate in part, and remand.

The relevant facts underlying Gardner's conviction follow. Between 3:00-3:20 a.m. on June 24, 2019, Dan Phillips was driving a tow truck along Pool Road in McCracken County. As he was driving, he observed a vehicle parked partly in a driveway with its exterior lights turned off. Because the rear-end of the vehicle was protruding onto the roadway, Phillips nearly struck it. He noticed that the driver's door was standing open and that the interior of the vehicle was illuminated. He stopped his tow truck to investigate, but he saw no one. Phillips alerted police.

Deputy Zack Dunigan of the McCracken County Sheriff's Office responded to the scene at approximately 3:30 a.m. In the driveway of the residence at 3400 Pool Road, Deputy Dunigan observed a parked vehicle with the driver door open. No part of the vehicle then appeared to be protruding onto the roadway. Dunigan observed an individual moving about a camper parked near the residence. As he pulled his cruiser into the driveway, the individual appeared to wave him away.

Deputy Dunigan parked the cruiser, got out, and approached the man, who met him in the driveway. The man was carrying a hard-hat; he later identified himself as Gardner. Dunigan would later testify that Gardner's eyes were dilated

-2-

and that he was having trouble standing still. Deputy Dunigan became suspicious that Gardner was under the influence of narcotics. He asked Gardner if the house belonged to him. Gardner indicated that the house belonged to his uncle and that he (Gardner) was living in the camper on the property. Dunigan questioned him about the vehicle in the driveway. Gardner indicated that he had "just parked it there" and that he was about to head out to get gas and go to work. For safety, Deputy Dunigan patted him down.

Dunigan felt what Gardner identified as a large torch-lighter. Dunigan observed several other torch-lighters in the vehicle. Dunigan would later testify that in his experience, torch-lighters were often found with drug paraphernalia and were commonly used when smoking methamphetamine. Gardner denied that he had any weapons but indicated that he had a knife in his pocket that Dunigan had not detected during the pat-down. When Dunigan asked if he could check Gardner's pockets, Gardner refused.

Still suspicious about Gardner's behavior and his presence outside the residence at that hour, Deputy Dunigan pressed Gardner for more information. He asked Gardner whether he had consumed illegal drugs or if he had them on his person. Gardner denied that he had consumed drugs or that he was carrying any. Gardner indicated that he could not speak with Dunigan any longer because it was nearly 6:00 a.m. He repeated that he was about to leave for work.

Dunigan then indicated that he wanted to search Gardner's person, and Gardner refused and began walking away from Dunigan toward the residence. Dunigan asked him to stop. Gardner indicated that he was going to get his uncle, the property owner. Dunigan indicated to Gardner that he was not free to leave and commanded him to stop. When he again failed to do so, Deputy Dunigan grabbed Gardner's wrist. Gardner wrenched his arm away and began to run. Dunigan caught up to him and tackled Gardner to the ground. Gardner struggled and would not be handcuffed. Deputy Dunigan would later testify that during the scuffle, Gardner kept reaching for his (Gardner's) waistband and that he (Dunigan) feared that he was attempting to retrieve a weapon. When a second sheriff's deputy arrived at the scene, the men were able to handcuff Gardner and place him in the back of Dunigan's cruiser.

Deputy Dunigan conferred with the homeowner, who confirmed that Gardner was living on the property. As he again approached the location of his struggle with Gardner, Dunigan noticed the hard-hat and beside it a small plastic bag that contained a crystal-like substance. It field-tested as methamphetamine.

On July 26, 2019, Gardner was indicted on charges of public intoxication, fleeing and evading police, resisting arrest, and possession of a controlled substance. He was arraigned on August 12 and entered a plea of not guilty. Gardner was released on bail on October 1, 2019. After Gardner violated

the conditions of his release, a warrant was issued for his arrest on November 25, 2019.

Gardner was tried on December 5, 2019. Following presentation of testimony, Dunigan's "body-cam" footage, and other evidence, Gardner's counsel moved for a directed verdict at the close of the Commonwealth's case. After an extensive hearing, the trial court denied the motion. Gardner presented his defense and renewed his motion for a directed verdict at the close of all the evidence. The trial court again denied the motion.

After closing statements, the jury deliberated for a few minutes. It found Gardner guilty of possession of a controlled substance and resisting arrest. The jury recommended three-years' imprisonment as punishment for possession of methamphetamine – the maximum sentence. For resisting arrest, it imposed a fine of $500.

Judgment of conviction was entered on February 19, 2020. Gardner was sentenced by the court to three-years' imprisonment, probated for five years. He was ordered to pay court costs of $130.00 and a fine of $70.00. Gardner was allowed to proceed *in forma pauperis* and to have counsel appointed. This matter-of-right appeal followed.

On appeal, Gardner contends that the trial court erred in four ways. First, he argues that the trial court erred by failing to order, *sua sponte*, the

suppression of the drug evidence.  Second, he contends that the trial court erred by failing to direct a verdict with respect to the charge of resisting arrest and to the charge of possession of a controlled substance.  Third, Gardner asserts that the trial court erred by failing to declare a mistrial, *sua sponte*, because of an argument by the prosecution in its closing statement; *i.e.*, that Gardner's refusal to permit Deputy Dunigan to search his pockets was evidence that he possessed methamphetamine.  Finally, Gardner contends that the trial court erred by imposing court costs and a fine because he is indigent.  We shall address these issues in the order in which they were presented.

Gardner argues first that the Commonwealth's presentation of the drug evidence constituted a violation of his rights under the Fourth Amendment of the United States Constitution and Sections Two and Ten of the Kentucky Constitution.  Gardner acknowledges that he did not file a motion to suppress the drug evidence, however, and that he did not object to presentation of the evidence at trial.  We interpret Gardner's argument to mean that the trial court's failure, *sua sponte*, to exclude the evidence constituted palpable error resulting in injustice sufficient to justify reversal of his conviction.

RCr[1] 10.26 provides that a palpable error which affects the substantial rights of a party may be considered by the court on appellate review -- even where

---

[1] Kentucky Rules of Criminal Procedure.

-6-

it has not been properly preserved. In order to be considered "palpable," an error "must be easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). We may grant relief only upon determining that manifest injustice has resulted from the error. RCr 10.26.

Despite his failure to file a motion to suppress, Gardner believes that once the trial court became aware of the facts and circumstances surrounding the search and seizure leading to the discovery of methamphetamine, it erred by failing to exclude the drug evidence as "fruit of the poisonous tree." We disagree.

The trial court's role is to ensure a fair trial; it is "not burdened by the duty to try the case on behalf of defense counsel." *Thompson v. Commonwealth*, 147 S.W.3d 22, 40 (Ky. 2004). The provisions of RCr 8.27 require a trial court to consider suppression when a party has filed a motion requesting that the evidence be suppressed. A motion to suppress evidence must be made within a reasonable time before trial except for good cause shown. RCr 8.18(1), RCr 8.27. Where a party fails to raise an objection to the evidence, the objection is deemed to be waived. RCr 8.18(2). A trial court is under no obligation to suppress evidence on its own motion. Gardner failed to move to suppress the drug evidence or to object to its admission. Therefore, the court's failure to suppress it, *sua sponte*, does not constitute error. Consequently, we decline to review the issue under the palpable-error standard.

Second, Gardner contends that the trial court erred by failing to direct a verdict with respect to the charges of resisting arrest and possession of a controlled substance. We disagree.

The Supreme Court of Kentucky outlined the trial court's standard for directing a verdict as well as the appellate court's standard of review in *Commonwealth v. Benham,* 816 S.W.2d 186 (Ky. 1991) (citing *Commonwealth v. Sawhill,* 660 S.W.2d 3 (Ky. 1983)). When considering a motion for a directed verdict, the *Benham* Court held that "the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Id.* at 187. The trial court must assume that the evidence presented by the Commonwealth is true, reserving for the jury questions as to the credibility of witnesses and the weight to be attributed to the testimony. *Id.* If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, the motion for a directed verdict should be denied. *Id.* The test for appellate review is a stringent one. After considering all the evidence, we must determine if "it would be clearly unreasonable for a jury to find guilt . . . ." *Id.* at 187. If so, "only then the defendant is entitled to a directed verdict of acquittal." *Id.* (citation omitted).

The evidence indicates that it was not clearly unreasonable for the jury to find Gardner guilty on the charge of resisting arrest. The relevant portion

of the pertinent statute, KRS[2] 520.090(1)(a), requires a showing that the criminal defendant intentionally prevented or attempted to prevent his arrest by "[u]sing or threatening to use physical force or violence against the peace officer or another[.]"

Gardner contends that there was insufficient proof to support the charge of resisting arrest because the Commonwealth failed to establish that he used any physical force or violence against the deputies. He argues that he merely pulled away from Deputy Dunigan and reached for his waistband. In contrast, the Commonwealth argues that Gardner used force against the deputies when he struggled against them for an extended period of time, refused to put his hands behind his back, and prevented them from placing him in handcuffs.

Deputy Dunigan's testimony, coupled with the "body-cam" footage, indicates that Gardner fought vigorously and aggressively against the deputies while they attempted to handcuff him. This conduct constituted a use of physical force against the officers in an attempt to prevent his arrest. *See Montgomery v. Commonwealth*, 505 S.W.3d 274 (Ky. App. 2016). Thus, it was not clearly unreasonable for the jury to have found Gardner guilty on the charge of resisting arrest. The trial court did not err by denying the motion for a directed verdict.

Nor was it clearly unreasonable for the jury to find Gardner guilty on the charge of possession of a controlled substance. The relevant portion of the

---

[2] Kentucky Revised Statutes.

pertinent statute, KRS 218A.1415(1)(c), provides that "a person is guilty of possession of a controlled substance in the first degree when he or she knowingly and unlawfully possesses . . . [m]ethamphetamine[.]" Conviction under this statute may be based upon actual or constructive possession. *Commonwealth v. James*, 586 S.W.3d 717, (Ky. 2019).

Gardner contends that there was insufficient proof to support the charge of possession because the Commonwealth failed to establish that he either actually or constructively possessed the plastic bag containing methamphetamine that was found in the yard. Gardner argues that it was mere conjecture that the bag of methamphetamine belonged to him because: the property was owned by his uncle; the yard that they shared was littered with leaves and random clutter; and any passerby could have thrown out the bag of methamphetamine. The Commonwealth points to the proximity of the bag to Gardner's hard-hat and the location of his struggle with deputies; his behavior and appearance indicating that he was under the influence of a stimulant; and his possession of a torch-lighter. It contends that these facts constitute circumstantial evidence that Gardner either actually or constructively possessed the bag of methamphetamine.

Taken as a whole, the circumstantial evidence presented at trial allowed a reasonable jury to conclude that Gardner was in actual possession of the bag containing methamphetamine, which he dislodged from his clothing during the

struggle with the deputies. Deputy Dunigan testified that during his struggle with him, Gardner repeatedly reached for his waistband. When Deputy Dunigan returned to the area after Gardner had been handcuffed and placed in the cruiser, he discovered the plastic bag lying next to Gardner's discarded hard-hat. The bag was not near the road. It was in pristine condition and, therefore, it did not appear to have been there long. There is sufficient circumstantial evidence linking Gardner to the bag of methamphetamine. It was sufficient as a matter of law to avoid a directed verdict. Because it was not clearly unreasonable to for the jury to have found Gardner guilty on the charge of possession of methamphetamine, the trial court did not err by denying the motion for a directed verdict.

Third, Gardner contends that the trial court erred by failing to declare a mistrial, *sua sponte*, when the prosecution argued in its closing statement that Gardner's refusal to permit Deputy Dunigan to search his pockets was evidence that he possessed methamphetamine. Gardner acknowledges that this argument was not preserved for review. He again seeks our review for palpable error under the provisions of RCr 10.26.

Gardner focuses on two references made by the Commonwealth during its closing argument: (1) Gardner's reluctance to engage with Deputy Dunigan and (2) statements referring specifically to Gardner's comments and demeanor indicating that he did not want to be searched. He claims that these

statements violated his rights under the Fourth Amendment of the U.S. Constitution and Section 10 of the Kentucky Constitution. In support of his argument, Gardner cites this Court to *Deno v. Commonwealth*, 177 S.W.3d 753 (Ky. 2005).

In *Deno*, an alleged rape victim accused Deno of raping her. During the investigation that followed, detectives requested that Deno present a biological sample. Upon his refusal to comply with the officers' request, a search warrant was obtained, and the specimen was collected [from Deno] the next day. *Id* at 762. The fact of his initial refusal was presented by the Commonwealth as evidence of Deno's guilt, and the Commonwealth so argued. Deno appealed his conviction. Based upon the trial court's erroneous statements concerning Deno's right to hybrid representation, the Supreme Court of Kentucky reversed and remanded for a new trial.

The Court also considered Deno's contention that the Commonwealth had misused his legitimate assertion of the right to remain silent and not to provide self-incriminating evidence outside the presence of counsel. The Court observed that during its closing argument, the Commonwealth had elaborated on Deno's refusal to submit the biological sample voluntarily. The Commonwealth argued as follows:

> Then when the officer goes out to talk to the defendant, does he say willingly, "yes, I'll be happy to submit to the

-12-

examination that you're requesting"? No, he says, "No, I won't," and causes the detective to have to go get a search warrant and they come back out and then they get the blood and samples that they needed from him. Does that sound like somebody who's in the right? Or does that sound like somebody who, again, is trying to avoid the consequences of his actions? Does that sound like an opportunistic rapist that took advantage of a young girl, 18 year old college freshman who's got a lot going for her, for him to just take her and put her on the floor of that trailer and without her knowledge or consent forcing himself into her? That's what this case is about.

*Deno*, 177 S.W.3d at 760.

In *dicta*, the Supreme Court concluded that the characterization of Deno's initial refusal as evidence of his guilt and reference thereto in closing statement violated the defendant's constitutional rights under the Fourth Amendment and Section 10 of the Kentucky Constitution. The Court opined that an objection to evidence that Deno refused to produce a specimen and presentation of an argument referring to it should be sustained upon Deno's retrial.

At Gardner's trial, the Commonwealth introduced footage captured by Deputy Dunigan's "body-cam." Gardner could be heard to reply in the negative when Dunigan asked if he could search Gardner's pockets after conducting a pat-down.

During its closing statement, the Commonwealth argued that the bag of methamphetamine had been on Gardner's person before he grappled with the deputies. It contended that circumstantial evidence proved it to be so. It noted that

-13-

the bag of methamphetamine had been collected from the very spot of the struggle; that it was found near Gardner's hard-hat; that it was not near the roadway; and that no one else had been near it. The Commonwealth reminded the jury that Gardner possessed a torch-lighter commonly used in the smoking of methamphetamine and that he appeared to be under the influence of a stimulant. With respect to Gardner's suspicious behavior, the Commonwealth asked the jury to recall that Gardner's pupils were dilated and that he appeared agitated and unwilling "to engage" with the deputy. The Commonwealth disputed the defense's argument that Gardner had talked cogently with Deputy Dunigan. The Commonwealth reminded the jury of a point in Gardner's conversation with Deputy Dunigan when Gardner indicated that it was nearly 6:00 a.m. However, the correct time was around 3:30 a.m. The Commonwealth said: "It [the conversation] didn't really make sense. He didn't really want to engage with him. He was talking quickly. He wasn't looking at him. He wasn't answering any questions. And, he really wasn't making that much sense."

Later, the Commonwealth argued that the jury could infer from the "body-cam" footage that Gardner had possessed the bag of methamphetamine prior to the struggle because Gardner was "trying to get away from law enforce -- from Officer Dunigan. He didn't want him patting him down, he didn't want him doing anything further to him."

Gardner also takes issue with the Commonwealth's remark that the jury could find that Gardner knew that what he was holding was methamphetamine because Gardner

> was evasive, he tried like everything to get back to his house; he didn't want to be, um, he didn't want to be searched by the police; he didn't want to talk to the police; he struggled with the deputy; um, he was reaching for his waistband; he was trying to hide something; he was acting like a man who was trying to hide something, that goes to his knowledge that it was meth, ok? -- that he knew it was meth.

We agree that it is improper to draw adverse inferences from the failure of an accused to comply with a request to be searched. Such an inference essentially penalizes a defendant for exercising his right to refuse. However, the evidence and statements challenged in his case are qualitatively different from those challenged in *Deno*. In the case before us, no inference or innuendo need be drawn from facts that clearly speak for themselves. The Commonwealth merely summarized in detail the sequence of events from which Gardner's guilt could be clearly deduced. Moreover, Gardner did not object to these statements.

"[A] party must timely inform the court of the error and request the relief to which he considers himself entitled. Otherwise, the issue may not be raised on appeal." *Blount v. Commonwealth*, 392 S.W.3d 393, 398 (Ky. 2013) (citing *West v. Commonwealth*, 780 S.W.2d 600, 602 (Ky. 1989)). RCr 9.22 also mandates that a party must "make[ ] known to the court the action which that party

desires the court to take or any objection to the action of the court, and on request of the court, the grounds therefor." One may forfeit even one's most basic rights by failing to assert them in a timely manner. *Commonwealth v. Jones*, 283 S.W.3d 665 (Ky. 2009) (citing *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). "When a defendant's attorney is aware of an issue and elects to raise no objection, the attorney's failure to object may constitute a waiver of an error having constitutional magnitude." *Salisbury v. Commonwealth,* 556 S.W.2d 922, 927 (Ky. App. 1977). In light of the record, we cannot conclude that Gardner's counsel was unaware of the issue. Consequently, the failure to object constitutes a waiver of the error, and we again decline to review under the palpable-error standard.

Fourth and last, Gardner contends that the trial court erred by imposing court costs of $130.00 and a fine of $70.00 because he is indigent. The Commonwealth appears to concede that imposition of the fine was erroneous under the provisions of KRS 534.040(4). Therefore, we vacate that portion of the court's order and remand for entry of an appropriate order striking the fine previously mandated.

With respect to court costs, KRS 23A.205(2) provides that they shall be taxed against a defendant upon conviction unless the court finds that the defendant is a poor person as defined by the provisions of KRS 453.190(2) -- *and*

that he or she is unable to pay court costs or will be unable to pay the court costs in the foreseeable future. KRS 453.190(2) provides as follows:

> A "poor person" means a person who has an income at or below one hundred prevent (100%) on the sliding scale of indigency established by the Supreme Court of Kentucky by rule or is unable to pay the costs and fees of the proceeding in which he is involved without depriving himself or his dependents of the necessities of life, including food, shelter, or clothing.

The imposition of costs must be reversed only if: (1) Gardner met the definition of a "poor person" under KRS 453.190(2) *and* (2) evidence showed that he could not pay court costs either at the time of sentencing or in the foreseeable future. Otherwise, the trial court's imposition of costs was mandated by statute.

The trial court conducted a sentencing hearing on December 10, 2020. During the hearing, the court was not asked to determine Gardner's poverty status. However, the court did engage Gardner directly and advised him that counsel could ask that costs be waived. Gardner indicated that he had $200.00 to pay into court that day. As a result, the court imposed a minimal fine of $130.00 and gave Gardner ten days to pay it. Regardless of Gardner's status as a "poor person," the circuit court concluded that Gardner could pay court costs either at the time of sentencing or in the foreseeable future. Consequently, the imposition of costs as mandated by statute was not erroneous.

We AFFIRM in part, VACATE in part, and REMAND to the McCracken Circuit Court.

ALL CONCUR.


BRIEFS FOR APPELLANT:

Brandon Neil Jewell
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky
Frankfort, Kentucky

Lauren Lewis
Assistant Attorney General
Frankfort, Kentucky